1  VANESSA H. WIDENER (Bar No. 203967)
        vhw@amclaw.com
2  JENNIFER S. MUSE (Bar No. 211779)
        jsm@amclaw.com
3  ANDERSON, McPHARLIN & CONNERS LLP
   707 Wilshire Boulevard
4  Suite 4000
   Los Angeles, California  90017-3623
5  TELEPHONE: (213) 688-0080 ♦ FACSIMILE: (213) 622-7594

6  Attorneys for Creditor,
   Central Mortgage Company dba Central
7  Mortgage Loan Servicing Company

8

9              UNITED STATES BANKRUPTCY COURT

10      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

11

12  In re                              Case No. 5:15-bk-53344-MEH

13  DAVID MORGENSEN AND                Adv No.
    PATRICIA MORGENSEN
14                                     Chapter 13
              Debtors.
15
                                       **DECLARATION OF LESLIE
16                                     CRIDER IN SUPPORT OF
                                       CENTRAL MORTGAGE
17                                     COMPANY'S OBJECTION TO
                                       CONFIRMATION OF THE
18                                     CHAPTER 13 PLAN**

19

20

21          I, Leslie Crider, declare as follows:

22          1.      I am over 18 years of age and am employed as an Officer of

23  Creditor/Objector Central Mortgage Company dba Central Mortgage Loan

24  Servicing Company ("Central Mortgage") in the above-entitled action.  In such

25  capacity, I am authorized to make this declaration regarding the loan described

26  below (the "Loan").

27          2.      This declaration is submitted in support of Central Mortgage's

28  Opposition to Debtors David Morgensen and Patricia Morgensen's Chapter 13 Plan

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

(the "Plan").

3.      I have personal knowledge of the matters set forth herein, and if called upon as a witness to testify thereto, I could and would competently do so.

4.      I have access to and am familiar with Central Mortgage's books and records regarding the Loan, Central Mortgage's servicing records, and copies of the applicable Loan documents.  I am familiar with the manner in which Central Mortgage maintains its books and records, including computer records relating to the servicing of the Loan.  Central Mortgage's records are made at or near the time of the occurrence of the matters set forth in such records, by an employee or representative with knowledge of the acts or events recorded.  Such records are obtained, kept and maintained by Central Mortgage in the regular course of business.  Central Mortgage relies on such records in the ordinary course of its business.

5.      On or about March 15, 2005, the Debtors, for valuable consideration, made, executed and delivered to Downey Savings and Loan Association, F.A. ("Downey") an Adjustable Rate Note in the principal sum of $770,000.00 ("Note"). Pursuant to the terms of the Note, Debtors agreed and are obligated to make monthly principal and interest payments.  Attached hereto as Exhibit A is a true and correct copy of the Note.

6.      The Note was secured by a Deed of Trust encumbering the real property located at 375 Woodland Drive, Scotts Valley, California 95066, and recorded on March 21, 2005 in the Santa Cruz County Recorder's Office as Instrument No. 2005-0018568 ("Deed of Trust").  Attached hereto as Exhibit B is a true and correct copy of the Deed of Trust.

7.      Downey's beneficial interest in the Note and Deed of Trust was assigned and transferred to Central Mortgage as evidenced by the Assignments of Deed of Trust recorded in the Santa Cruz County Recorder's Office on January 9, 2006 as Instrument No. 2006-0001288 and July 13, 2011 as Instrument No. 2011-

1385883.1 05985-193-A

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

0027909. A true and correct copy of the January 9, 2006 Assignment of Deed of Trust is attached hereto as Exhibit C; a copy of the July 13, 2011 Assignment of Deed of Trust is attached hereto as Exhibit D.

8. On or about October 22, 2015, the Debtors filed a Chapter 13 bankruptcy petition. Their proposed Chapter 13 Plan was filed on November 2, 2015 (the "Plan"). I have reviewed the Plan, which indicates that the Debtors will apply for a loan modification. As such, the Debtors did not account for any of the prepetition arrearages due to Central Mortgage, and instead contend that they will update or modify their Plan if the loan modification is denied.

9. On November 30, 2015, Central Mortgage filed its Proof of Claim. (See Proof of Claim [Claim 2].) The Proof of Claim shows the prepetition arrearages currently due and owing as **$320,196.74**. The prepetition arrearages are calculated as follows:

 a. One monthly mortgage payments missed at $2,426.28;

 b. Thirty-one monthly mortgage payments missed at $2,363.50 each;

 c. Nine monthly mortgage payments missed at $5,949.66 each;

 d. Twelve monthly mortgage payments missed at $5,667.29 each;

 e. Five monthly mortgage payments missed at $5,823.37 each;

 f. Seven monthly mortgage payments missed at $5,621.77 each;

 g. Six monthly mortgage payments missed at $7,125.43 each;

 h. Late fees totaling $5,688.34;

 i. Attorney's fees totaling $3,187.50;

 j. Filing fees and court costs totaling $406.00;

 k. Recording fees totaling $154.00;

 l. Appraisal/broker's price opinion fees totaling $985.00;

 m. Property inspection fees of $464.00;

 n. Publication fees totaling $1,010.00; and

 o. Certified mail fees of $369.40.

1385883.1 05985-193-A

10. As of the filing of this objection, Central Mortgage does not have record of the Debtors submitting a recent request for a loan modification. Therefore, in order to protect Central Mortgage's interest, beginning January 1, 2016, the Debtors will need to make the monthly mortgage payment to Central Mortgage in the amount of $4,060.72 and the Debtors will have to increase the plan payments by $5,336.62 per month to cure the prepetition arrearages owed Central Mortgage within the sixty (60) months of the proposed plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed this 4th day of December, 2015 at Little Rock, Arkansas.

Leslie Crider

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623

1385883.1 05985-195-A

| INDEX OF EXHIBITS TO DECLARATION OF LESLIE CRIDER | | |
|---|---|---|
| **Exhibit** | **Description** | **Page** |
| | | |
| Exhibit A | Note | 6 |
| Exhibit B | Deed of Trust | 14 |
| Exhibit C | Assignment of Deed of Trust (January 9, 2006) | 41 |
| Exhibit D | Assignment of Deed of Trust (July 13, 2011) | 43 |

1387876.1

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 5 of 47

**Exhibit A**

# ADJUSTABLE RATE NOTE
### (12-Month Treasury Average Index)
### (Payment and Rate Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

| March 15, 2005 | Scotts Valley | CA |
|---|---|---|
| [Date] | [City] | [State] |

375 Woodland Drive, Scotts Valley, CA 95066

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **770,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Downey Savings and Loan Association, F.A.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) below, I will pay interest at a yearly rate of **4.921 %**. Thereafter, until the first Interest Change Date (as defined in Section 2(B) below), I will pay interest at a yearly rate of **1.100 %**. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Change Dates

The interest rate I will pay may change on the first day of **May** , **2005** , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than **11.050** %.

### (D) Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields ("Monthly Yields") on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)." The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters** percentage point(s) **(2.750 %)** to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Change Date.

MULTI STATE ADJUSTABLE RATE NOTE - MTA Index - Single Family

1141N1.UFF (07/22/04) CR20711 RG        Page 1 of 4        Initials: _____    1/01

5243

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on        **May 1** ,
**2005**        . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before Principal. If, on       **April 1, 2045**      , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA  92658-6060**
                                                    or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be U.S. $        **1,983.61**        . This amount may change.

**(C) Monthly Payment Changes**

My monthly payment may change as required by Section 3(D) below beginning on the first day of       **May** ,
                **2006**             , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to one hundred   **ten**
                                percent (         **110**         %) of the Principal
amount I originally borrowed. My unpaid Principal could exceed that maximum due to the limited payments and interest rate increases. If so, on the date that my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my current interest rate in substantially equal payments.

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

■■■5243

J14:N2.UFF (01/12/2001) 7970 VC                      Page 2 of 4                Initials: _DN~Jdl_            1/01

Case: 15-53344     Doc# 19     Filed: 12/04/15     Entered: 12/04/15 15:13:19     Page 8 of 47
007

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen (15)** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

█████5243

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 9 of 47
008

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
**DAVID MORGENSEN** -Borrower

_____ (Seal)
**PATRICIA MORGENSEN** -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

WITHOUT RECOURSE, PAY TO THE ORDER OF

DOWNEY SAVINGS AND LOAN ASSOCIATION, F.A.

BY: _____
JOHN AMADOR
MANAGER, CUSTODIAL OPERATIONS

[Sign Original Only]

████5243

1141N4.UFF 10/18/2002 11:21:3 JS          Page 4 of 4          Initials: ____          1/01

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 10 of 47
009

# RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Number: ███5243      Date: March 15, 2005

Property Address: 375 Woodland Drive, Scotts Valley, CA 95066

FOR VALUE RECEIVED, the undersigned (collectively, the Borrower) agrees that the following shall be incorporated into that certain deed of trust of even date herewith and any riders thereto (collectively, the Security Instrument) executed by Borrower, as trustor, in favor of Downey Savings and Loan Association, F.A. (the Lender) as beneficiary, and also into that certain promissory note and any riders thereto (collectively, the Note) of even date herewith executed by Borrower in favor of Lender. The Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note is referred to in the Note as the Note Holder. To the extent that the provisions of this Rider to Promissory Note and Security Instrument (the Rider) are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of this Rider shall prevail and shall supersede any such inconsistent provisions of the Security Instrument and/or the Note. The performance of the provisions of this Rider shall be secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions and agreements contained in this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter the FHLMC or FNMA or any other investor should retransfer the Security Instrument and Note to the Lender or Lender's successor in interest, the provisions and agreements in this Rider shall thereupon be reinstated without the need for any additional writing or document.

1. LATE CHARGES AND ACCRUED INTEREST.

In the event any installment is not received by the Note Holder within fifteen (15) days after its due date, Borrower shall pay to the Note Holder a late charge in an amount equal to SIX

percent ( 6.000%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, such period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit the Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

Payments for this loan are due on the 1st of each month and a late charge will be assessed if payments are not received by the 16th of each month. If sufficient funds are not available when Note Holder attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed.

2. INTEREST ON PAST DUE SUMS.

Should any sum due hereunder, including accumulated interest, not be paid in accordance with the terms of the Note, the sums not paid shall bear interest at the same rate as the principal, or to the maximum rate allowed by law, whichever is less.

Case: 15-53344   Doc# 19   Filed: 12/04/15   Entered: 12/04/15 15:13:19   Page 11 of 47

010

### 3. ACCELERATION; REMEDIES.

If any monthly installment, including late charges, under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other deed of trust or other instrument secured by the Property, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice and regardless of any prior forbearance. In such event, Lender, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand for sale and shall cause to be filed of record a written notice of default and of election to cause to be sold the Property. Lender shall also deposit with the Trustee this Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Lender may offset its bid to the extent of the amount owing to it under the Note and this Security Instrument, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the time of sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. The Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.

Any person, including Borrower, the Trustee or Lender may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, and of this Security Instrument, including costs of evidence of title in connection with such sale, the Trustee first shall apply the proceeds of sale to payment of all sums expended under the terms of this Security Instrument not then repaid, with accrued interest at the rate then payable under the Note or Notes secured thereby, and then to payment of all other sums secured thereby and, if thereafter there be any proceeds remaining, shall distribute them to the person or persons legally entitled thereto.

### 4. HAZARD OR PROPERTY INSURANCE.

Unless Lender and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, the Lender may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder and (ii) be subject to the provisions of this paragraph 4 hereof with respect to insurance proceeds.

Lender may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

Case: 15-53344     Doc# 19     Filed: 12/04/15     Entered: 12/04/15 15:13:19     Page 12 of 47

5243

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider to Promissory Note and Security Instrument.

_____ (Seal)      _____ (Seal)
DAVID MORGENSEN                    -Borrower    PATRICIA MORGENSEN            -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                   -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                   -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                   -Borrower

# Exhibit B

013

·070003488

Recording Requested By:
**Downey Savings and Loan**
**Association, F.A.**
Return To:
**Downey Savings and Loan**
**Association, F.A.**
**P.O. Box 6060, 3501 Jamboree**
**Rd, Newport Beach, CA**
**92658-6060**

Prepared By:
**Downey Savings and Loan**
**Association, F.A.**
**P.O. Box 6060, 3501 Jamboree Rd,**
**Newport Beach, CA  92658-6060**

RECORDED AT THE REQUEST OF
OLD REPUBLIC TITLE COMPANY

2005-0018568

Recorded
Official Records
County Of
SANTA CRUZ
GARY E. HAZELTON
Recorder
CAROL D. SUTHERLAND
Assistant
01:28PM 21-Mar-2005

| REC FEE     81.00
|
|
|
|
|
|
| LAH
| Page 1 of 25

GC05D3
5243

———————[Space Above This Line For Recording Data]———————

# DEED OF TRUST

Title Order No.: 49041990-149
Escrow No.: 49041990-149
APN: 093-162-33

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **March 15, 2005**                    ,
together with all Riders to this document.
(B) **"Borrower"** is **DAVID MORGENSEN and PATRICIA MORGENSEN, Husband and Wife**

Borrower's address is **375 Woodland Drive , Scotts Valley CA 95066**
                                                        . Borrower is the trustor under this Security Instrument.
(C) **"Lender"** is **Downey Savings and Loan Association, F.A.**

Lender is a **federally chartered savings association**
organized and existing under the laws of **the United States of America**

5243

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3005 1/01

**-6(CA)** (0207)
Page 1 of 15                    Initials:

VMP MORTGAGE FORMS · (800)521-7291

*EXHIBIT B*

Recorded
Official Records
County Of
SANTA CRUZ
GARY E. HAZELTON
Recorder
CAROL D. SUTHERLAND
Assistant
01:28PM 21-Mar-2005

Lender's address is 3501 Jamboree Road, Newport Beach, CA  92660

Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is DSL Service Company, A California Corporation

**(E) "Note"** means the promissory note signed by Borrower and dated March 15, 2005
The Note states that Borrower owes Lender seven hundred seventy thousand and 00/100
Dollars
(U.S. $770,000.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2045
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |

**Rider to Promissory Note and Security
Instrument**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

Initials: DMPM

5243

-6(CA) (0207)

Page 2 of 15

Form 3005   1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **Santa Cruz** :

        [Type of Recording Jurisdiction]                                      [Name of Recording Jurisdiction]

**Legal Description attached hereto and made a part hereof**

Parcel ID Number: **093-162-33**                      which currently has the address of

**375 Woodland Drive**                                                       [Street]

**Scotts Valley**                           [City], California **95066**      [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(CA) (0207)                            Page 3 of 15           Initials:                       5243       Form 3005   1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-6(CA) (0207)  Page 4 of 15  Initials: ____  Form 3005  1/01  5243

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

 

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 20 of
019 47

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

5243



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



Initials: DM RM

■■■5243

Form 3005 1/01

VMP®-6(CA) (0207)

Page 7 of 15

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

5243

022

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

Initials: _DM_ _PM_

5243

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 24 of 47

023

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



-6(CA) (0207)

Page 10 of 15

Initials: DM PM

5243

Form 3005  1/01

Case: 15-53344   Doc# 19   Filed: 12/04/15   Entered: 12/04/15 15:13:19   Page 25 of 47

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



-6(CA) (0207)          Page 11 of 15         Initials: _DM_ _PM_      5243      Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



Initials: DMJL

5243

-6(CA) (0207)

Page 12 of 15

Form 3005   1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Case: 15-53344   Doc# 19   Filed: 12/04/15   Entered: 12/04/15 15:13:19   Page 28 of
47

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                              DAVID MORGENSEN           -Borrower

_____     _____ (Seal)
                              PATRICIA MORGENSEN        -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                            -Borrower

5243

-6(CA) (0207)                 Page 14 of 15                 Form 3005  1/01

State of California
County of Santa Clara                                    } ss.

On March 15, 2005 before me, W. Williams

                                                    personally appeared

DAVID   MORGENSEN   &   PATRICIA   MORGENSEN


, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

                                                                (Seal)

W. WILLIAMS
Comm. # 1312784
NOTARY PUBLIC - CALIFORNIA
Santa Clara County
My Comm. Expires Aug. 7, 2006

# EXHIBIT A

OLD REPUBLIC TITLE COMPANY

ORDER NO.  0707003488

The land referred to in this Report is situated in the County of <u>Santa Cruz , in the unincorporated area,</u>
State of California, and is described as follows:

PARCEL I:

Being a portion of Lots 4 and 5, as shown upon that certain map entitled,
"Record of Survey Map of Lands in the S.W. 1/4 of Section 33, T. 9 S. R. 1 W.,
M.D.B. & M., Santa Cruz County, California", filed for record June 27, 1955 in
Volume 33 of Maps, Page 29, Santa Cruz County Records and more particularly
described as follows:

Beginning in the middle of a right of way 40 feet in width as shown on the above
entitled map of the most Southern corner of the lands contained in the deed from
Joe Ferioli, et ux, to Robert E. Conway, et ux, recorded July 15, 1960, in
Volume 1330, Page 599, Official Records of Santa Cruz County; running thence
from said point of beginning, leaving said right of way and along the Southern
boundary of said lands of Conway and along the lands contained in the Deed to
Robert Conway, et ux., by Deed recorded June 1, 1959, in Volume 1249, Page 445,
Official Records of Santa Cruz County, North 63° 24' 20" East 210.99 feet to the
Southeastern corner of the last mentioned lands of Conway; thence along the
Southerly prolongation of the Eastern line of the last mentioned lands of Conway
South 0° 43' West 273.01 feet to the Northeastern corner of the lands contained
in the Deed to Richard D. Remick, et ux., recorded July 1, 1960, in Volume 1328,
Page 149, Official Records of Santa Cruz County; thence along the Northern line
of said lands of Remick, North 70° 23' 10" West 150.00 feet to an angle; thence
North 12° 10' 50" West 53.30 feet to the centerline of said first mentioned 40
foot right of way; thence leaving the lands of Remick and along the centerline
of said 40 foot right of way North 4° 11' 30" East 37.52 feet to an angle and
thence North 59° 32' 30" West 35.00 feet to the place of beginning.

PARCEL II:

Being a part of Lot 5, as shown on the map entitled, "Record of Survey Map of
lands in the S.W. 1/4 of Section 33 T. 9 S. R. 1 W., M.D.B. & M., Santa Cruz
County, California", filed for record June 27, 1955, in Volume 23 of Maps, Page
29, Santa Cruz County Records and further described as follows:

Beginning on the East line of said Lot 5, at a station from which the Southeast
corner of said Lot 5 bears South 0° 43' West 40.0 feet distant; thence along the
East line of said Lot 5, North 0° 43' East 10 feet, more or less, to the point
of intersection thereof with a line parallel and distant 10 feet at right angles
from the Southeasterly line and the Northeasterly prolongation of the
Southeasterly line of that certain parcel of land described in the Deed to
Steven B. Dudley, et ux., recorded January 19, 1966, in Volume 1741, Page 129,
Official Records of Santa Cruz County; thence Southwesterly along said parallel
line to the point of intersection thereof with the Southwesterly line of said
Parcel; thence South 26° 28' 35" East along said Southwesterly line 10 feet,
more or less, to the most Southerly corner of said Parcel; thence North 65° 27'
East along the Southeasterly line of said Parcel to the point of beginning.

PARCEL III:

ORT 3157-C

Being a part of Section 33, Township 9 South, Range 1 West, M.D.B. & M., and being also a part of the lands conveyed to Richard D. Remick, et ux., by Deed recorded September 10, 1959, in Volume 1270, of Official Records, at Page 185, Santa Cruz County Records, and further bounded and described as follows:

Beginning at the 1/16th Section Line East and West through the Southwest quarter of said Section 33, at a station from which the Northeast corner of lands conveyed to Chet Mantor, et ux., by Deed recorded August 10, 1960, in Volume 1335, of Official Records, at Page 402, Santa Cruz County Records, bears North 89° 59' West 105.7 feet distant; thence South 0° 43' West 32.2 feet; thence Southwesterly 117 feet, more or less, to the Southeast corner of said lands conveyed to Mantor, thence along the East boundary of lands shown on Record of Survey Map filed in Volume 33 of Maps, at Page 29, Santa Cruz County Records, South 0° 43' West 572.34 feet to the Southeast corner of the lands conveyed to Robert Conway, et ux., by Deed recorded June 1, 1959, in Volume 1249, of Official Records, at Page 445, Santa Cruz County Records, thence South 89° 59' East 163.7 feet to the East boundary of said land of Remick; thence along said East boundary, North 0° 43' East 661.34 feet to the Northeast corner thereof, on said 1/16 section line; thence North 89° 59' West 60 feet to the place of beginning.

Excepting therefrom so much of the herein described land as conveyed to James M. Lawson, et ux., by Deed recorded January 30, 1968, in Volume 1862, of Official Records, at Page 281.

Also excepting therefrom so much of the herein described land as conveyed to Dion L. Johnson, et ux., by Deed recorded April 16, 1969 in Volume 1945, of Official Records, at Page 215.

ORT 3157-E

# RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Number: ██████5243          Date: **March 15, 2005**

Property Address: **375 Woodland Drive, Scotts Valley, CA  95066**

FOR VALUE RECEIVED, the undersigned (collectively, the Borrower) agrees that the following shall be incorporated into that certain deed of trust of even date herewith and any riders thereto (collectively, the Security Instrument) executed by Borrower, as trustor, in favor of Downey Savings and Loan Association, F.A. (the Lender) as beneficiary, and also into that certain promissory note and any riders thereto (collectively, the Note) of even date herewith executed by Borrower in favor of Lender. The Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note is referred to in the Note as the Note Holder. To the extent that the provisions of this Rider to Promissory Note and Security Instrument (the Rider) are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of this Rider shall prevail and shall supersede any such inconsistent provisions of the Security Instrument and/or the Note. The performance of the provisions of this Rider shall be secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions and agreements contained in this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter the FHLMC or FNMA or any other investor should retransfer the Security Instrument and Note to the Lender or Lender's successor in interest, the provisions and agreements in this Rider shall thereupon be reinstated without the need for any additional writing or document.

1. LATE CHARGES and ACCRUED INTEREST.

In the event any installment is not received by the Note Holder within fifteen (15) days after its due date, Borrower shall pay to the Note Holder a late charge in an amount equal to **SIX** percent (    **6.000**%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, such period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit the Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

Payments for this loan are due on the 1st of each month and a late charge will be assessed if payments are not received by the 16th of each month.  If sufficient funds are not available when Note Holder attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed.

2. INTEREST ON PAST DUE SUMS.

Should any sum due hereunder, including accumulated interest, not be paid in accordance with the terms of the Note, the sums not paid shall bear interest at the same rate as the principal, or to the maximum rate allowed by law, whichever is less.

Case: 15-53344   Doc# 19   Filed: 12/04/15   Entered: 12/04/15 15:13:19   Page 33 of 032 47

## 3. ACCELERATION; REMEDIES.

If any monthly installment, including late charges, under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other deed of trust or other instrument secured by the Property, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice and regardless of any prior forbearance. In such event, Lender, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand for sale and shall cause to be filed of record a written notice of default and of election to cause to be sold the Property. Lender shall also deposit with the Trustee this Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Lender may offset its bid to the extent of the amount owing to it under the Note and this Security Instrument, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the time of sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. The Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.

Any person, including Borrower, the Trustee or Lender may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, and of this Security Instrument, including costs of evidence of title in connection with such sale, the Trustee first shall apply the proceeds of sale to payment of all sums expended under the terms of this Security Instrument not then repaid, with accrued interest at the rate then payable under the Note or Notes secured thereby, and then to payment of all other sums secured thereby and, if thereafter there be any proceeds remaining, shall distribute them to the person or persons legally entitled thereto.

## 4. HAZARD OR PROPERTY INSURANCE.

Unless Lender and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, the Lender may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder and (ii) be subject to the provisions of this paragraph 4 hereof with respect to insurance proceeds.

Lender may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

Case: 15-53344   Doc# 19   Filed: 12/04/15   Entered: 12/04/15 15:13:19   Page 34 of 47
033

5243

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider to Promissory Note and Security Instrument.

_____ (Seal)
DAVID MORGENSEN                -Borrower

_____ (Seal)
PATRICIA MORGENSEN            -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

1D107-3.UFF (12/10/04) CR25897 VC

034

# ADJUSTABLE RATE RIDER
### (12-Month Treasury Average Index)
### (Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **15th** day of **March** , **2005** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Downey Savings and Loan Association, F.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

### 375 Woodland Drive, Scotts Valley, CA 95066

[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2. INTEREST
### (A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) below, I will pay interest at a yearly rate of **4.921 %**. Thereafter, until the first Interest Change Date (as defined in Section 3(C) below), I will pay interest at a yearly rate of **1.100 %**. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

███████5243

**MULTI STATE ADJUSTABLE RATE RIDER - MTA Index** - Single Family

1141R1.UFF (01/12/2001) 7970 VC    Page 1 of 5    Initial: _JM_ _AM_   1/01

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 36 of
035

**(B) Interest Change Dates**

    The interest rate I will pay may change on the first day of **May** , **2005** , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**

    My interest rate will never be greater than **11.050** %.

**(D) Index**

    Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields ("Monthly Yields") on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)." The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent twelve months and dividing by 12.

    The most recent Index figure available as of 15 days before each Interest Change Date is called the "Current Index."

    If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

    Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters** percentage point(s) **2.750** % to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Change Date.

**3. PAYMENTS**

**(A) Time and Place of Payments**

    I will pay Principal and interest by making a payment every month.

    I will make my monthly payments on the first day of each month beginning on **May 1** , **2005** . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before Principal. If, on **April 1, 2045** , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

    I will make my monthly payments at **P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

    Each of my initial monthly payments will be U.S. $ **1,983.61** . This amount may change.

**(C) Payment Change Dates**

    My monthly payment may change as required by Section 3(D) below beginning on the first day of **May** , **2006** , and on that day every 12th month thereafter. Each of these

███5243

I141R2.UFF (10/26/2001) 9681 VC      Page 2 of 5      Initials: _DM PM_      1/01

dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to one hundred **ten**

                                                                 percent (          **110**          %)

of the Principal amount I originally borrowed. My unpaid Principal could exceed that maximum amount due to the limited payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my current interest rate in substantially equal payments.

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be

■■■5243

I141R3.UFF (01/12/2001) 7970 VC          Page 3 of 5          Initials: DM fu  1/01

037

given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

█████5243

1141R4.UFF (01/12/2001) 7970 VC          Page 4 of 5          Initials: DM PM  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)           _____ (Seal)
**DAVID MORGENSEN**          -Borrower      **PATRICIA MORGENSEN**        -Borrower

_____ (Seal)           _____ (Seal)
                             -Borrower                                   -Borrower

_____ (Seal)           _____ (Seal)
                             -Borrower                                   -Borrower

_____ (Seal)           _____ (Seal)
                             -Borrower                                   -Borrower

[Sign Original Only]

████5243

I141R5.UFF (05/09/03) CR-2054 VC          Page 5 of 5          Initials: _____ 1/01

**Exhibit C**



**2006-0001288**

| | |
|---|---|
| Recorded | REC FEE 9.00 |
| Official Records | |
| County of | |
| Santa Cruz | |
| GARY E. HAZELTON | |
| Recorder | |
| | JEB |
| 08:20AM 09-Jan-2006 | Page 1 of 1 |

[RECORDING REQUESTED BY]
NATIONWIDE TITLE CLEARING
[AND WHEN RECORDED MAIL TO]
Nationwide Title Clearing
2100 Alt. 19 North
Palm Harbor, FL 34683

DSL#: 9041495243
Effective Date: 12/01/2005

**CORPORATE ASSIGNMENT OF DEED OF TRUST**

**FOR GOOD AND VALUABLE CONSIDERATION,**
the sufficiency of which is hereby acknowledged, the undersigned, **DOWNEY SAVINGS &
LOAN ASSOCIATION, F.A. ,A CALIFORNIA CORPORATION, WHOSE ADDRESS IS 3501 JAMBOREE
RD. 3RD FLOOR N. TOWER, NEWPORT BEACH, CA 92660, ASSIGNOR,** by these presents does
convey, grant, sell, assign, transfer and set over the described Deed of Trust
together with the certain note(s) described therein, without recourse,
representation or warranty, together with all right, title and interest secured
thereby, all liens, and any rights due or to become due thereon to **MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. ,A DELAWARE CORPORATION, ITS SUCCESSORS OR
ASSIGNS, AS NOMINEE FOR CENTRAL MORTGAGE COMPANY, AN ARKANSAS CORPORATION, C/O P.O.
BOX 2026, FLINT, MI 48501-2026, (ASSIGNEE),**
Said Deed made by **DAVID MORGENSEN AND PATRICIA MORGENSEN** and recorded on
03/21/2005 as Inst# 2005-0018568 in Book  Page  in the office of the SANTA CRUZ
County Recorder, CA.

Dated: 12/13/2005
**DOWNEY SAVINGS & LOAN ASSOCIATION, F.A.**

By: _____

   **CRYSTAL MOORE / VICE PRESIDENT**

STATE OF FLORIDA            COUNTY OF PINELLAS
On 12/13/2005 before me, MARIA LEONOR GERHOLDT DD 0434521 , Notary Public,
personally appeared CRYSTAL MOORE , personally known to me (or proved to me on the
basis of satisfactory evidence) to be the person whose name is subscribed to the
within instrument and acknowledged to me that he/she executed the same in his/her
authorized capacity, and that by his/her signature on the instrument the person, or
entity upon behalf of which the person acted, executed the same.
WITNESS MY hand and official seal.

_____
MARIA LEONOR GERHOLDT DD 0434521   Notary Public

My Commission expires: 05/26/2009
Prep by: J. Lesinski/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

```
DSCMC 4984414
CJ716508   MIN ████████5243█ MERS PHONE 1-888-679-MERS
```

> MARIA LEONOR GERHOLDT
> Notary Public State of Florida
> My Commission Exp. May 26, 2009
> No. DD 0434521
> Bonded through (800) 432-4254
> Florida Notary Assn., Inc.

form5/FRMCA1

**Exhibit D**



2011-0027909 07/13/2011 08:42:41 AM
OFFICIAL RECORDS OF Santa Cruz County
Sean Saldavia Recorder
RECORDING FEE  $24 00
COUNTY TAX  $0 00
CITY TAX  $0 00



ADTR
3 PGS
RCD157

[RECORDING REQUESTED BY
Fidelity National Title Insurance Company
c/o Trustee Corps

AND WHEN RECORDED MAIL TO ]

**CENTRAL MORTGAGE COMPANY**
**801 John Barrow Road,**
**Suite 1**
**Little Rock, AR  72205**

[Space above this line for recorder s use only]

Trustee Sale No CA0816582   Loan No ███5243   Title Order No H800800
MERS # ████████5243█   PHONE(888) 679-6377

# ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to <u>CENTRAL MORTGAGE</u> <u>COMPANY D/B/A CENTRAL MORTGAGE LOAN SERVICING COMPANY</u> all beneficial interest under that certain Deed of Trust dated <u>03/15/2005</u>, executed by <u>DAVID MORGENSEN AND PATRICIA MORGENSEN,</u> <u>HUSBAND AND WIFE</u>, as Trustor, to <u>DSL SERVICE COMPANY, A CALIFORNIA CORPORATION</u>, as Trustee, and <u>Recorded on 03/21/2005 as Document No  2005-0018568</u> of official records in the Office of the County Recorder of <u>Santa Cruz</u> County, <u>California</u> , real property described as follows

PARCEL I
BEING A PORTION OF LOTS 4 AND 5, AS SHOWN UPON THAT CERTAIN MAP ENTITLED,
"RECORD OF SURVEY MAP OF LANDS IN THE S W  1/4 OF SECTION 33, T 9 S R  1 W, M D B & M ,
SANTA CRUZ COUNTY, CALIFORNIA", FILED FOR RECORD JUNE 27, 1955 IN VOLUME 33 OF MAPS,
PAGE 29, SANTA CRUZ COUNTY RECORDS AND MORE PARTICULARLY DESCRIBED AS FOLLOWS

BEGINNING IN THE MIDDLE OF A RIGHT OF WAY 40 FEET IN WIDTH AS SHOWN ON THE
ABOVE ENTITLED MAP OF THE MOST SOUTHERN CORNER OF THE LANDS CONTAINED IN THE DEED
FROM JOE FERIOLI, ET UX, TO ROBERT E  CONWAY, ET UX, RECORDED JULY 15, 1960, IN VOLUME
1330, PAGE 599, OFFICIAL RECORDS OF SANTA CRUZ COUNTY, RUNNING THENCE FROM SAID
POINT OF BEGINNING, LEAVING SAID RIGHT OF WAY AND ALONG THE SOUTHERN BOUNDARY OF
SAID LANDS OF CONWAY AND ALONG THE LANDS CONTAINED IN THE DEED TO ROBERT CONWAY,
ET UX , BY DEED RECORDED JUNE 1, 1959, IN VOLUME 1249, PAGE 445, OFFICIAL RECORDS OF
SANTA CRUZ COUNTY, NORTH 63° 24' 20" EAST 210 99 FEET TO THE SOUTHEASTERN CORNER OF
THE LAST MENTIONED LANDS OF CONWAY, THENCE ALONG THE SOUTHERLY PROLONGATION OF
THE EASTERN LINE OF THE LAST MENTIONED LANDS OF CONWAY SOUTH 0° 43' WEST 273 01 FEET
TO THE NORTHEASTERN CORNER OF THE LANDS CONTAINED IN THE DEED TO RICHARD D
REMICK, ET UX , RECORDED JULY 1, 1960, IN VOLUME 1328, PAGE 149, OFFICIAL RECORDS OF
SANTA CRUZ COUNTY, THENCE ALONG THE NORTHERN LINE OF SAID LANDS OF REMICK, NORTH
70° 23' 10" WEST 150 00 FEET TO AN ANGLE, THENCE NORTH 12° 10' 50" WEST 53 30 FEET TO THE
CENTERLINE OF SAID FIRST MENTIONED 40 FOOT RIGHT OF WAY, THENCE LEAVING THE LANDS OF
REMICK AND ALONG THE CENTERLINE OF SAID 40 FOOT RIGHT OF WAY NORTH 4° 11' 30" EAST
37 52 FEET TO AN ANGLE AND THENCE NORTH 59° 32' 30" WEST 35 00 FEET TO THE PLACE OF
BEGINNING

PARCEL II

BEING A PART OF LOT 5, AS SHOWN ON THE MAP ENTITLED, "RECORD OF SURVEY MAP OF LANDS
IN THE S W  1/4 OF SECTION 33 T  9 S R  1 W , M D B & M , SANTA CRUZ COUNTY, CALIFORNIA",

FILED FOR RECORD JUNE 27, 1955, IN VOLUME 23 OF MAPS, PAGE 29, SANTA CRUZ COUNTY RECORDS AND FURTHER DESCRIBED AS FOLLOWS BEGINNING ON THE EAST LINE OF SAID LOT 5, AT A STATION FROM WHICH THE SOUTHEAST CORNER OF SAID LOT 5 BEARS SOUTH 0° 43' WEST 40 0 FEET DISTANT, THENCE ALONG THE EAST LINE OF SAID LOT 5, NORTH 0° 43' EAST 10 FEET, MORE OR LESS, TO THE POINT OF INTERSECTION THEREOF WITH A LINE PARALLEL AND DISTANT 10 FEET AT RIGHT ANGLES FROM THE SOUTHEASTERLY LINE AND THE NORTHEASTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN THE DEED TO STEVEN B DUDLEY, ET UX , RECORDED JANUARY 19, 1966, IN VOLUME 1741, PAGE 129, OFFICIAL RECORDS OF SANTA CRUZ COUNTY, THENCE SOUTHWESTERLY ALONG SAID PARALLEL LINE TO THE POINT OF INTERSECTION THEREOF WITH THE SOUTHWESTERLY LINE OF SAID PARCEL, THENCE SOUTH 26° 28' 35" EAST ALONG SAID SOUTHWESTERLY LINE 10 FEET, MORE OR LESS, TO THE MOST SOUTHERLY CORNER OF SAID PARCEL, THENCE NORTH 65° 27' EAST ALONG THE SOUTHEASTERLY LINE OF SAID PARCEL TO THE POINT OF BEGINNING

PARCEL III

BEING A PART OF SECTION 33, TOWNSHIP 9 SOUTH, RANGE 1 WEST, M D B & M , AND BEING ALSO A PART OF THE LANDS CONVEYED TO RICHARD D REMICK, ET UX , BY DEED RECORDED SEPTEMBER 10, 1959, IN VOLUME 1270, OF OFFICIAL RECORDS, AT PAGE 185, SANTA CRUZ COUNTY RECORDS, AND FURTHER BOUNDED AND DESCRIBED AS FOLLOWS

BEGINNING AT THE 1/16TH SECTION LINE EAST AND WEST THROUGH THE SOUTHWEST QUARTER OF SAID SECTION 33, AT A STATION FROM WHICH THE NORTHEAST CORNER OF LANDS CONVEYED TO CHET MANTOR, ET UX , BY DEED RECORDED AUGUST 10, 1960, IN VOLUME 1335, OF OFFICIAL RECORDS, AT PAGE 402, SANTA CRUZ COUNTY RECORDS, BEARS NORTH 89° 59' WEST 105 7 FEET DISTANT, THENCE SOUTH 0° 43' WEST 32 2 FEET, THENCE SOUTHWESTERLY 117 FEET, MORE OR LESS, TO THE SOUTHEAST CORNER OF SAID LANDS CONVEYED TO MANTOR, THENCE ALONG THE EAST BOUNDARY OF LANDS SHOWN ON RECORD OF SURVEY MAP FILED IN VOLUME 33 OF MAPS, AT PAGE 29, SANTA CRUZ COUNTY RECORDS,
SOUTH 0° 43' WEST 572 34 FEET TO THE SOUTHEAST CORNER OF THE LANDS CONVEYED TO ROBERT CONWAY, ET UX , BY DEED RECORDED JUNE 1, 1959, IN VOLUME 1249, OF OFFICIAL RECORDS, AT PAGE 445, SANTA CRUZ COUNTY RECORDS, THENCE SOUTH 89° 59' EAST 163 7 FEET TO THE EAST BOUNDARY OF SAID LAND OF REMICK, THENCE ALONG SAID EAST BOUNDARY, NORTH 0° 43' EAST 661 34 FEET TO THE NORTHEAST CORNER THEREOF, ON SAID 1/16 SECTION LINE, THENCE NORTH 89° 59' WEST 60 FEET TO THE PLACE OF BEGINNING

EXCEPTING THEREFROM SO MUCH OF THE HEREIN DESCRIBED LAND AS CONVEYED TO JAMES M LAWSON, ET UX , BY DEED RECORDED JANUARY 30, 1968, IN VOLUME 1862, OF OFFICIAL RECORDS, AT PAGE 281 ALSO EXCEPTING THEREFROM SO MUCH OF THE HEREIN DESCRIBED LAND AS CONVEYED TO DION L JOHNSON, ET UX , BY DEED RECORDED APRIL 16, 1969 IN VOLUME 1945, OF OFFICIAL RECORDS, AT PAGE 215

TOGETHER with the note or notes therein described and secured thereby, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust including the right to have reconveyed, in whole or in part, the real property described therein

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 45 of 47

Trustee Sale No  CA08 10582
Loan No ████ 95243
Title Order No  H800800

Dated  03/25/08

Beneficiary

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC**

By  Lou Ann Howard, Assistant Secretary

STATE OF   Arkansas

COUNTY OF   Saline

On March 25, 2008 before me, Teresa A  Taber, a notary public, personally appeared Lou Ann Howard who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

I certify under PENALTY OF PERJURY under the laws of the State of Arkansas that the foregoing paragraph is true and correct

WITNESS my hand and official seal



Notary Public in and for said County and State

3

Case: 15-53344    Doc# 19    Filed: 12/04/15    Entered: 12/04/15 15:13:19    Page 46 of
047

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is Suite 4000, 707 Wilshire Boulevard, Los Angeles, California 90017-3623.

A true and correct copy of the foregoing document entitled (*specify*):  DECLARATION OF LESLIE CRIDER IN SUPPORT OF CENTRAL MORTGAGE COMPANY'S OBJECTION TO CONFIRMATION OF THE CHAPTER 13 PLAN  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  December 4, 2015  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Attorney for Debtor:   David A. Boone    ecfdavidboone@aol.com, ecflodab@gmail.com
Trustee:   Devin Derham-Burk    ctdocs@ch13sj.com
Attorney for Central Mortgage:   Jennifer Muse    jsm@amclaw.com, lmg@amclaw.com
U.S. Trustee:   Office of the U.S. Trustee / SJ    USTPRegion17.SJ.ECF@usdoj.gov, ltroxas@hotmail.com

☐Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  December 4, 2015 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Debtor**
David Alan Morgensen
375 Woodland Drive
Scotts Valley, CA  95066

Attn:  Millie McGowan, Courtroom Deputy for
The Hon. M. Elaine Hammond
United States Courthouse, Room 3035
280 South First Street
San Jose, CA  95113-3099

☐Service information continued on attached page.

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| December 4, 2015 | Lisa Greene | */s/ Lisa Greene /s/* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.